## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | Bankruptcy Case No. 10-26337 |
| SHUBH HOTELS PITTSBURGH, LLC, | Chapter 11 |
| Debtor. | Judge Jeffery A. Deller |
| | |
| DR. KIRAN PATEL, | Adv. Pro. No. _____ |
| Plaintiff, | |
| v. | |
| CARBON CAPITAL II REAL ESTATE CDO 2005-1, LTD., and BLACKROCK FINANCIAL MANAGEMENT, INC., as sub-special servicer to CARBON CAPITAL II REAL ESTATE CDO 2005-1, LTD.'S special servicer, MIDLAND LOAN SERVICES, INC., | |
| Defendants. | |

## COMPLAINT

Dr. Kiran Patel ("Dr. Patel" or the "Plaintiff"), by undersigned counsel, pursuant to Rule 7001(8), Fed. R. Bankr. P., and 11 U.S.C. §§ 105(a), 502(a), 510(c) and 1126(e), files this *Complaint* (the "Complaint") against Carbon Capital II Real Estate CDO 2005-1, Ltd. (the "Carbon Cayman") and BlackRock Financial Management, Inc. ("BlackRock"), as sub-servicer to Carbon Cayman's special servicer, Midland Loan Services, Inc. ("Midland") (Carbon Cayman, BlackRock and Midland, collectively, "Defendants"), and states:

### Parties

1.     Dr. Patel is the owner of Pittsburgh Grand LLC, a Florida limited liability company ("PG") that owns ninety-nine percent (99%) of the membership interests of the Debtor,

Shubh Hotels Pittsburgh, LLC, a Florida limited liability company and the debtor in possession in the captioned chapter 11 case (the "Debtor"). Pittsburgh Grand Manager, LLC, is a Florida limited liability company, and owns one percent of the membership interests of the Debtor and serves as the Debtor's Manager ("PGM").

2.     Carbon Capital II Real Estate CDO 2005-1, Ltd. is a Cayman Islands limited liability company having an address in care of BlackRock, Inc., 40 East 52nd Street, New York, NY 10022.

3.     BlackRock Financial Management, Inc. is a Delaware corporation and the Sub-Special Servicer to Carbon Capital II Real Estate CDO 2005-1, Ltd.'s Special Servicer, Midland Loan Services, Inc., having an address of BlackRock, Inc., 40 East 52nd Street, New York, NY 10022.

4.     Upon information and belief, Midland is the Servicer to Carbon Capital II Real Estate CDO 2005-1, Ltd, having an address c/o of BlackRock, Inc., 40 East 52nd Street, New York, NY 10022

### Jurisdiction and Venue

5.     The Court has jurisdiction over this adversary proceeding pursuant to 11 U.S.C. §§ 105(a), 502(a), 510(c) and 1126(e) and 28 U.S.C. § 1334.

6.     This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

### Background

8.     The Debtor operates a hotel located at the entrance of Point Park, downtown Pittsburgh, Pennsylvania (the "Hotel").

9.      On September 7, 2010 (the "Petition Date"), the Debtor filed its Voluntary Petition for relief under chapter 11, title 11, United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Western District of Pennsylvania (the "Court").

10.      Effective September 21, 2010, PG and PGM acquired the membership interests of the Debtor from their former owners, affiliates of Mr. Atul Basaria.

11.      The Debtor continues to operate its business and manage its property as a debtor in possession pursuant to 11 U.S.C. § 1107(a) and 1108. The Defendants recently sought appointment of a trustee by motion dated October 25, 2010 (the "Trustee Motion") (Doc. No. 312), but no trustee, or examiner has been appointed. The Court set a preliminary hearing on the Trustee Motion for November 4, 2010. (Doc. No. 320)

12.      On September 24, 2010, an Official Committee of Unsecured Creditors was formed.

13.      Since the first days of this case, Defendants have conducted a scheme and plan in dealing with Debtor and its funding sources, and in conducting litigation proceedings, designed to induce the Debtor and its funding sources to invest substantial amounts of capital to improve the Hotel based on Defendants' false promises to modify the loans, and then thwart the Debtor's reorganization efforts for the sole purpose of obtaining control and ownership of the Debtor's property (and the capital spent to improve it) for the Defendants' benefit and to the detriment of all other constituents. As the evidence has revealed, the inequitable scheme perpetuated by the Defendants started well before the commencement of this Bankruptcy Case.

14.      The Defendants have acted inequitably in three ways: (a) seeking to obtain ownership of the Hotel for their exclusive benefit and to the detriment of all junior creditors as well as equity; (b) scheming to induce third parties, including Dr. Patel, to fund substantial

3

amounts to improve the value of the Hotel, by misleading the funding parties into believing that Defendants would approve Dr. Patel as owner of the Hotel and restructure their debt, when in fact Defendants never intended to do so, and were instead negotiating arrangements to take title to the Hotel and operate it for their exclusive benefit; and (c) conspiring with Hilton Hotels, a party related to BlackRock through BlackRock's origins from Blackstone Group and Blackstone Group's ownership of Hilton, to manufacture a technical default under the Defendants' loan documents, exploit that technical default to obtain title to the Hotel, and then operate the Hotel under a pre-negotiated franchise agreement with Defendants' related party, Hilton Hotels.[1]

## **Factual Allegations Common to All Counts**

15.    The Debtor acquired the Hotel from Hilton Hotels International ("Hilton") on or about May 22, 2006.  The Hotel had operated as a Hilton hotel for over 50 years.  In fact, the Hotel was the first hotel built by Conrad Hilton and was originally owned and operated by Hilton.  However, as with many hotels, the Hotel ultimately was sold but still maintained the Hilton flag through a franchise arrangement.  For a considerable period of time prior to the sale, Hilton had neglected the Hotel's maintenance and deferred any improvements, so that by the time of the sale, the Hotel required a substantial, expensive and elaborate renovation (including, e.g., structural improvements to all of the Hotel rooms) to bring the Hotel up to Hilton brand standards.  Hilton neither insisted that the Hotel satisfy Hilton brand standards while it owned the Hotel, nor wanted to invest the capital necessary to renovate the Hotel.  Accordingly, it sold the iconic hotel for approximately twenty-eight million dollars ($28,000,000), far below the sixty

---

[1] The Plaintiff reserves the right to supplement this Complaint to add further causes of action and facts, as the Defendants continue to produce on practically a daily basis documents that should have already been produced. Accordingly, it is likely that additional facts and evidence exist which will further support the allegations set forth herein and could lead to additional claims.

five to seventy million dollar value a renovated Hotel would have commanded.  These numbers provide some scope to the enormity of the renovation task required.

16.     The Hotel is the largest hotel in the City of Pittsburgh, with more than 700 guest rooms and approximately 40,000 square feet of meeting space.

17.     The Debtor financed the acquisition of the Hotel, in part, from Carbon Cayman's predecessor in interest, Column Financial, Inc. ("CFI"), through a loan of $49.6 million, which was an acquisition and construction loan.

18.     Carbon Cayman, on behalf of its investors, claims a first lien on, and security interest in, substantially all of the Debtor's real and personal assets.  On September 15, 2010, Defendants filed a Proof of Claim (Claim No. 3-1) asserting a secured claim in the amount of $49,666,666.67 in principal plus interest, fees, costs, expenses and charges (the "Initial Claim"). On October 4, 2010, Defendants filed a Proof of Claim (Claim No. 3-2) amending the Initial Claim, asserting a secured claim in the amount of $49,666,666.67 in principal plus interest, fees, costs, expenses and charges.

19.     BlackRock purchased the $49.6MM loan for Carbon Cayman on or about August 29, 2007, pursuant to a Loan Sale Agreement dated August 29, 2007 between CFI and Carbon Cayman, and became the Debtor's principal secured creditor.  Upon information and belief, the Defendants paid far less than the face amount of the Loan to buy it, but BlackRock has not yet provided definitive information on the amount paid for the loan.

20.     Plaintiff submits that Hilton and the Defendants acted in concert in an effort to take control and ownership from the Debtor to the Defendants, for the Defendants' benefit and possibly Hilton's benefit.  BlackRock and Hilton are related to each other, at least through

common origins. In 1992, certain Blackstone Group executives separated to form BlackRock (borrowing the "Black" part of their name). Blackstone has owned Hilton since 2007.

21.     On or about August 2008, Hilton sent Debtor a notice of default and termination letter due to an "Unacceptable" score for the Hotel's condition and alleged failure to comply with brand standards (the "First Hilton Default Notice").

22.     At the time of First Hilton Default Notice, the Debtor was not in monetary default with Carbon Cayman, but the First Hilton Default Notice threatened to put the Debtor into non-monetary default under Carbon Cayman Loan. However, the value of the Hotel at this time was about equal to the secured debt and foreclosure would have resulted in a loss to the Defendants' investors.

23.     The First Hilton Default Notice, and Carbon Capital's threat to place the Debtor in non-monetary default as a result thereof, were intended to require, and did in fact require, the Debtor to expend additional substantial financial resources to gain compliance with Hilton's requirements.

24.     The First Hilton Default Notice is when the Defendants began to undertake transactions intended to place financial hurdles in front of the Debtor with the ultimate goal of owning the Hotel, when financially beneficial to the Defendants, to the detriment of all other constituents.

### The Defendants' Control Over the Debtor

25.     In response to the First Hilton Default Notice, the Defendants took steps to negotiate a forbearance agreement with the Debtor from September 2008 through May 2009. Defendants claim that the purpose of this agreement was to forebear from declaring the non-monetary defaults they threatened to assert, provided that the Debtor satisfy Hilton's

requirements. The terms of the forbearance agreement required, *inter alia,* the Debtor to: (1) complete renovation of rooms by September 19, 2008; (2) deliver an updated Product Evaluation Improvement Planner Report by September 19, 2008; (3) complete renovation of 18 guestrooms by October 16, 2008; (4) complete renovation of 12 common area corridors by October 31, 2008; (5) complete renovation of two lobby restrooms by November 15, 2008; (6) complete renovation of the restaurant by November 15, 2008; (7) complete renovation of the meeting room expansion, lobby expansion, and construction of the indoor swimming pool by May 15, 2009; (8) satisfy all outstanding Mechanics Liens filed against the Hotel; and (9) reduce certain outstanding accounts payable to no more than $1MM.

26.     While compliance with these items would have certainly put the Debtor in compliance with Hilton, they also would significantly enhance the value of the Hotel.

27.     This forbearance agreement was one of the significant transactions that, in conjunction with one another, eliminated the Debtor's ability to use and manage the Hotel without the approval of Carbon Cayman as to <u>any</u> use of revenues, <u>any</u> selection of expenses, or make <u>any</u> business or management decisions typical of ownership of real property and hotels particularly, other than decisions to benefit Defendants.

28.     Under the First Hilton Default Notice, which sought to terminate the Hilton franchise for an unacceptable score on the Hotel's condition, the Hotel renovation of the guest rooms, corridors and food and beverage outlets had to be completed by October 16, 2008. However the foreclosure value of the Hotel at the time was far below the secured debt and therefore Hilton and BlackRock were very willing to work with the Debtor on construction schedules. On September 18, 2008, Hilton inspected the property and because of satisfactory progress in the construction extended the construction deadline to April 1, 2009. On April 7,

2009, an inspection of the Hotel revealed the renovations of the guest rooms, corridors and restaurant spaces were successfully completed and the Debtor was advancing construction on the meeting spaces and lobby. An inspection was scheduled for the next phase of the construction for January 5, 2010 (which inspection the Hotel subsequently failed, engendering the beginning of the end of Defendant's "loan to own" scheme).

29.    Eloisa Mascarenas ("Mascarenas"), Carbon Cayman's Vice President and primary witness in court, testified that the value of the Hotel in early 2009 was $50.4 Million. At that time, the Defendants delayed in pursuing foreclosure because they wanted Debtor and Dr. Patel to continue investing in the Hotel, in order to maximize their subsequent return on investment.

30.    Throughout 2009 BlackRock's internal reports on the Hotel noted concerns regarding the Debtor's thin capitalization, expanding concerns about trade payables and arrearages for franchise fees, but also reflected BlackRock's willingness to work with the Debtor because there was no upside to Carbon Cayman at that time through the exercise of its remedy of foreclosure.

31.    In July of 2009 Dr. Patel agreed to begin making a series of unsecured loans to the Hotel to assist the former owners in satisfying the requirements of Hilton and the Defendants. Dr. Patel also began negotiations to acquire a majority of the Debtor's equity interests, all of which BlackRock approved and encouraged.

32.    BlackRock encouraged Dr. Patel to provide funding in July 2009 because Carbon Cayman was increasingly under-secured, valuing the Hotel at forty one million seven hundred thousand dollars ($41,700,000).

33.    The financial condition of the Hotel continued to deteriorate and by October of 2009 outstanding franchise fees had increased to $724,245 and the judgments and liens against

the property exceeded three million five hundred dollars ($3,500,000). At this time, BlackRock approved, in principal, a transaction for Dr. Patel to acquire control of the Debtor. Defendants agreed to reduce the principal balance of the loan to forty–five million dollars ($45,000,000) as part of their offer, to encourage Dr. Patel to continue to invest in the Hotel by making loans to it, acquire the equity of the Debtor and assume Defendants' loan to Debtor.

34.    In fact, in a BlackRock memorandum dated October 13, 2009, Mascarenas recommended the transfer of 89% of the Debtor's equity interest to an entity controlled by Dr. Patel. Thus, the Defendants knew that Dr. Patel had the capital and wherewithal to finish the construction and updating of the hotel as soon as 2009. However, the Defendants were simply biding their time and seeking to take advantage of Dr. Patel's extensive efforts to loan monies to be used for renovating and updating the Hotel by obtaining the property through foreclosure, and without investing a single more dime into the Hotel to ensure that the substantial renovation construction projects proceeded smoothly.

35.    In or about November 2009, consistent with the foregoing, BlackRock's internal records recommended that Defendants approve the  transfer of 89% of the equity of the Debtor to an entity controlled by Dr. Patel and favorable restructuring terms which included a reduction in the unpaid principal balance of the loan to forty-five million dollars ($45,000,000).

36.    In or about December 2009, the former owner of the Debtor, Atul Basaria, brought a new deal to the table under which a private equity company, HIG, was prepared to pay $67,000,000 for the Hotel if the construction was completed and the property could be transferred free and clear of liens. Based upon this proposal and the BlackRock restructuring proposal described above, Dr. Patel agreed to fund two million one hundred thousand dollars

($2,100,000) to pay down liens and for the negotiation of a definitive amendment to the Carbon Cayman debt.

37.     However, Defendants then declined to restructure and reduce the Loan as previously negotiated.   Instead, the Defendants insisted upon a transaction resulting in that certain First Amendment to Loan Agreement (the "Amendment") dated as of January 14, 2010. Pursuant to the Amendment, the Debtor was forced to (1) pay a loan exit fee equal to $100,000 for each month and partial month after the Amendment closing date to the transfer closing date for any transfer of the property; (2) pay the greater of 20% of the net proceeds of any prepayment or $2,750,000 for any closing that occurred on or after the first anniversary of the Amendment; (3) pay the greater of 20% of the prepayment net proceeds, or $2,750,000, in conjunction with any refinancing of the Loan at any time after the Amendment; (4) pay $2,750,000 in connection with repayment of the Loan in full at any time after the Amendment, including the initial maturity date, or the extended maturity date; and (5) pay, release, and satisfy outstanding liens (including mechanics' liens) at closing of the Amendment by escrowing $2,000,000.  The Debtor was also required to (6) complete the addition (expansion exterior) by December 1, 2010, as required by Hilton's PIP and Additional Build Out (Expansion interior) by July 15, 2011, and (7) enter into a management agreement with Crescent Hotels & Resorts.  The Amendment followed (by less than 10 days) the Hotel's failure to pass Hilton's inspection for the first time in 2010, and laid the cornerstone for the final stages of Defendants' loan-to-own scheme.

38.     These agreements, among other requirements the Amendment imposed upon the Debtor, were made as a result of Carbon Cayman's significant bargaining position over the Debtor.  The costs required to meet Hilton's ever expanding requirements had been substantially underestimated, and the Defendants' promises of a favorable loan restructuring, and Defendants'

consent to transfer ownership of the Hotel to Dr. Patel, had induced the Debtor and Dr. Patel to expend very substantial amounts to continue renovations. Defendants new loan restructuring terms sought to expropriate these investments by threatening to foreclose on the Hotel, which would forfeit all the money spent. Carbon Cayman was exercising complete control over the Debtor and depriving Debtor of any ability to make typical business judgment decisions, which furthered Carbon Cayman's strategy of eventually obtaining ownership of the Hotel improved by Debtor's and Dr. Patel's substantial investments.

39.     Some of the Amendment's onerous terms were described by Eloisa Mascarenas, Carbon Cayman's Vice President and primary witness in court, who testified at the hearing on the Stay Relief Motion that: (1) the Debtor would be in default of the loan if it sought to terminate the manager or Carbon Cayman did not approve of the manager; (2) the Debtor could not incur 1% of the loan balance in additional liabilities; (3) the Debtor was required to furnish the lender with an annual budget outlining projected revenues, expenses, and profit for the forthcoming year and that Carbon Cayman reviewed and approved the budget; and (4) all revenues generated by the property are deposited daily into a lockbox account held by PNC to augment Carbon Cayman's cash collateral, while releasing much less than the available Hotel cash flow to the Debtor.

40.     The Amendment required credit card companies and the Hotel manager to deposit Hotel revenues daily directly into the cash management account controlled by BlackRock. According to Mascarenas, Carbon Cayman had "sole dominion and control" over the lockbox account and cash management account and Carbon Cayman had "full discretion on the disposition of those funds" from the lockbox account; funds were swept or wired daily from the lockbox account to the cash management account, held by Keybank, and "the cash management

account was owned by Carbon Cayman with said funds being in the sole dominion and control of Carbon Cayman".

41.     Additionally, in 2010 the Defendants forced the payment of normal and necessary expenses such as payroll by Dr. Patel, even though there were funds available in the cash management account that could have been available to fund the payroll.

42.     Upon information and belief, Carbon Cayman also received regular granular data updates (including those funneled surreptitiously by Crescent, as described below), which are atypical of a lender in this type of loan, as to the status of the operations at the Hotel, and gave significant direction to the Debtor as to the selection of the general contractors, subcontractors, and various construction plans.

43.     Carbon Cayman over-reached and inequitably abused its power as a secured creditor to force upon the Debtor the requirement that Carbon Cayman exercise day-to-day control over the pre-petition Debtor's business affairs and dictate virtually every aspect of the business, rather than monitoring the Debtor's business affairs for financial stability at arms' length as would be typical in a lender/borrower relationship.

44.     By the degree of control the Defendants exerted over the Debtor, the Debtor became a mere instrumentality of the Defendants, unable to exercise any free will with regard to the payment of expenses, the selection of construction projects, or any other business decision. These events reached their pinnacle when in May of 2010 $358,000 remained in the cash management account while the Hotel had $212,000 in immediately due payables that  Carbon Cayman refused to pay.

45.     By the over-reaching acts of the Defendants, no reasonable arms' length financial controls existed and the Defendants should be considered an "insider" of the Debtor, because by their actions were as a "person in control" of the Debtor pursuant to 11 U.S.C. § 101(31)(C)(v).

**Loan-to-Own Scheme - Defendants Plan to Delay Foreclosure and to Enhance the Value of the Hotel for Their Sole Benefit**

46.     Carbon Cayman's strategy reached its fruition early 2010.  In January 2010, as outlined above, Hilton failed the Hotel on its first inspection of 2010 and the Defendants extracted substantial concessions from the Debtor in the Amendment.  As a result of the successful ongoing construction work and the clean up of the liens, funded by loans from Dr. Patel, the value of the Hotel markedly improved.  The internal reports from BlackRock at the time revealed a valuation of fifty-six million nine hundred thousand dollars ($56,900,000) or more than $15 million more than the $41.7 million value in July 2009.  BlackRock, now seeing significant upside potential, decided to spring the trap on its loan-to-own scheme and capture the Debtor's and Dr. Patel's substantial investments by foreclosing on the Hotel.

47.     The Defendants' plan was to lure Dr. Patel to complete the PIP, fund Hotel expenses and then find a way to obtain the asset themselves.  An April 2010 internal BlackRock memorandum recommended a strategy to wait for further stabilization of the property and create value which would enhance Carbon Cayman's prospective return on capital.  To advance their plan, BlackRock enticed Crescent to become loyal to them with a promise of a role as the Receiver when Carbon Cayman sought to foreclose.  BlackRock's internal records from August 9, 2010 reflect that since June 2010, Crescent was funneling inside information to BlackRock without notice to the Debtor.  This subversion of the Hotel manager constitutes further evidence of Defendants' inequitable conduct.

48.     The Defendants' loan-to-own scheme required them to manufacture a non-curable, non-monetary default and the Defendant's scheme focused on the provision in the Hilton franchise agreement allowing Hilton to terminate if the Hotel failed three inspections in a single year.  As noted, the Hotel had failed its January 2010 inspection, and so the Defendants needed only two more failures.  To furnish the second such failure, Crescent called an unprecedented surprise PIP inspection by Hilton on July 28, 2010.  Crescent gave the Debtor no prior notice of the inspection and so conspired with the Defendants to have the Debtor fail the inspection.  This contrived, surprise inspection failure, together with the failure of the inspection in January 2010, set up Hilton's opportunity to obtain three failing inspections in one year, which would allow Hilton to terminate the franchise agreement.  Such a Hilton termination, in turn, would allow Carbon Cayman to declare a non-curable non-monetary default and all Defendants to foreclose.  Where Carbon Cayman and Hilton had previously promised to work with the Debtor so long as Debtor and Dr. Patel funded substantial improvement to increase the Hotel's value, now that Debtor and Dr. Patel had created equity above the Carbon Cayman loan, they mandated strict compliance, with no notice to the Debtor.  In fact, Hilton and the Defendants used this contrived "inspection failure" to give Debtor notice of potential termination of the franchise if the Hotel failed an inspection on August 31, 2010.

49.     The final necessary step in the scheme was Hilton's decision to fail the Hotel during a planned inspection on August 31, 2010.  The Debtor and Dr. Patel made every effort to meet the inspection requirements, including making substantial additional expenditures to accelerate the construction schedules.  But the Defendants were sure that Hilton (related to BlackRock at least by common origins in Blackstone Group) would decide that the Hotel failed this last inspection:  BlackRock had its complaint ready to go and its Receiver lined up on the

day after the inspection. To make sure everything was in place for the trap to spring, Defendants sent a Hotel consultant and management company, Prism Hotels & Resorts, to inspect the property a week before the inspection date, on August 23, 2010. Much to BlackRock's dismay, Prism reported that the Hotel was going to meet the construction requirements.

50. The Hotel's failure during the August 31, 2010 inspection came as a complete and total shock to Hotel management, including Prism Hotels & Resorts, as the Hotel had carefully prepared for the inspection. Representatives of Prism, in particular, have testified that, at the time of the inspection, the Hotel was in much better condition than many other Hilton-franchised hotels they had visited. The failure was principally premised not upon Product Improvement Plan ("PIP") work actually being incomplete, but upon a failure to obtain ministerial approvals from Hilton—*despite the fact that all PIP work had been completed to Hilton's required specifications and with Hilton approved materials.* ***In other words, the Hotel failed not due to the quality of the product or workmanship, but because Hilton alleged that it had not obtained certain paperwork from Hilton.*** Regarding cleanliness, the Hotel was marked down significantly due a small number of alleged "stray hairs". In fact, the Hotel had gotten **higher** scores during the ***surprise*** inspection in July 2010.

51. The speed at which Hilton, perhaps not coincidentally an entity that is owned by the founder of BlackRock, implemented the termination further evidences the scheme. After announcing at 5 p.m. on August 31, 2010, that the inspector intended to fail the Hotel, Hilton shut down the Hotel's reservation system at 12:01 am on September 1, 2010, causing complete chaos at Hotel. The Defendants seized upon this contrived, false "inspection failure" and Hilton's franchise termination to declare the Debtor in default (even though the Debtor was current on all monetary obligations to Carbon Cayman) and the Defendants filed their

foreclosure action on the morning of September 3, 2010. The 85 page foreclosure complaint could not have been drafted overnight.

52. Through primarily the funding efforts of Dr. Patel, the value of the Hotel has substantially increased. The Cushman & Wakefield, Inc. unrebutted appraisal from September 2010 indicates that the value of the Hotel is now $54 Million and that, with the proposed Wyndham flag, the value of the Hotel would be $58 Million and that, upon completion of the final expansion and renovations, the value would be $66 Million.

53. In a July 8, 2010 internal memo, Mascarenas stated that the BlackRock valuation of the Hotel was $56.9 million.

54. For over one-year prior to the Petition Date, the Defendants sought "other investors" or "joint venturers" to take over the role of the Debtor in Carbon Cayman's "investment."

55. As an illustration of the Defendants conduct, Alex Tantliff from Hotel AVE sent an email to Mascarenas as soon as July 13, 2009, which said "I want to see the renovation that was done and the state of the expansion. We could do it under the guise of doing an appraisal for you. Hopefully we have the chance to work together again."

56. Further evidence of this scheme is evidenced, *inter alia,* in, an email that was sent to Mascarenas by Robert Hazards of Hersha Hospitality Trust on August 30, 2010, which stated–one day before the critical inspection--that: "I read over the wires that Prism had been appointed to 'oversee the day-to-day operation of the hotel.' I'm guessing that means they have been appointed receiver and that the management contract is still available if and when the Hilton defaults the borrower."

57.     After having previously recommended that Dr. Patel be approved as an owner of the Hotel, after having forced Dr. Patel to fund substantial expenses and renovations, after having the value of the Hotel significantly increased, the Defendants finally implemented their scheme.

58.     On August 9, 2010, Mascarenas recommended to the Defendants the foreclosure of the property in her "Request for Approval on Action of Resolution of Asset". Significantly, this recommendation is made *before* the final August 2010 inspection of the Hotel and Hilton's termination of the Debtor's franchise agreement.

59.     On September 3, 2010, BlackRock commenced a mortgage foreclosure proceeding in the Court of Common Pleas of Allegheny County, Pennsylvania, Case No. GD. 10-16673, citing non-monetary defaults under the loan documents.[2] Notably, Defendants filed this 85 page complaint three days after Hilton inspected the Hotel and two days after Hilton terminated its franchise.

60.     From July 2009 until the time that the foreclosure was commenced, based upon the Defendants own records, the value of the Hotel has increased by at least $15 Million. This increase occurred even in today's financial crisis where real estate values have plummeted.

61.     In its foreclosure action, Carbon Cayman sought the appointment of a receiver to safeguard its interests, but not those of any *other* creditor.

62.     After filing the foreclosure actions, the Defendants continued their inordinate and inappropriate efforts to control all aspects of the process, as evidenced by the results of discovery which reveals that Carbon Cayman was then seeking to control who would ultimately be the court-appointed receiver.

---

[2] Details concerning the initial loan from CFI and Carbon Cayman's purchase thereof are set forth in ¶¶ 12-20 in the *Emergency Motion for an Order Pursuant to 11 U.S.C. §§ 105(a) and 362(d)(1) and (d)(2) Granting Relief From the Automatic Stay* (the "Stay Relief Motion") (Doc. No. 7) which details are incorporated herein.

63.     For example, an email sent by Chris Pfohl of the Pyramid Companies on August 30, 2010, to Mascarenas contained a detailed proposal from Pyramid to be the receiver. This proposal was sent just one day before the Hotel failed its PIP inspection and evidences that the Defendants knew and planned for the Debtor to fail the inspection as the final trigger in their plan.

64.     Mascarenas stated in her testimony on October 27, 2010, at the hearing on the Stay Relief Motion that she would actually personally prefer Pyramid as a better alternative to Crescent Hotels and Resorts or Prism Hotels & Resorts (both are management companies for hotels).

65.     Thus, the Defendants after having (a) exercised control over the Debtor, (b) duped third parties into significantly enhancing the value of their collateral (at no cost to the Defendants), and (c) contrived a non-curable, non-monetary default under the loan documents, amazingly sought to control the proposed court-appointed fiduciary who would oversee the process so that the Defendants could maximize their unjust enrichment.

66.     The Debtor filed Chapter 11 to stop the foreclosure and to seek to reorganize for the benefit of all creditors.

67.     As set forth herein, the Defendants have engaged in inequitable conduct which has injured (and continues to injure) the Debtor and its other creditors and has conferred an unfair advantage in favor of Carbon Cayman and to the detriment of the Debtor's estate.

## Count I
### (Equitable Subordination Pursuant to 11 U.S.C. § 510(c))

68.     Plaintiff incorporates by reference, as if fully stated herein, the preceding allegations in paragraphs 1 to 67 of the Complaint.

69.     Defendants engaged in inequitable conduct as described in the Facts Common to All Counts section of this Complaint.

70.     Defendants' inequitable conduct has injured both the Debtor and other creditors of the Debtor.

71.     Defendants' inequitable conduct has conferred an unfair advantage on Defendants to the detriment of the Debtor's estate.

72.     Equitable subordination of Carbon Cayman's claim, as amended, is consistent with equitable principles and applicable bankruptcy law, and does not violate any provision of the Bankruptcy Code.

73.     Accordingly, the Court should subordinate the claim, as amended, filed by Carbon Cayman pursuant to section 510(c) of the Bankruptcy Code to all other claims that have been and will be asserted against the Debtor's estate.

## Count II
### (Tortious Interference With Business Relationship)

74.     Plaintiff incorporates by reference, as if fully stated herein, the preceding allegations in paragraphs 1 to 67 of the Complaint.

75.     There existed a business relationship between Dr. Patel and the Debtor, through his equity ownership and funds he had loaned to the Debtor.

76.     The sole purpose of the above-described actions taken by Carbon Capital, through BlackRock and Midland, was to harm Dr. Patel.

77. The means by which the above-described actions taken by Carbon Capital, through BlackRock and Midland, were taken were unlawful or improper.

78. The above-described actions taken by Carbon Capital, through BlackRock and Midland, have harmed Dr. Patel in respect of his business relationship with the Debtor.

79. The harm suffered by Dr. Patel includes, but is not limited to, (i) a reduction in value of his equity interests in the Debtor, and (ii) his ability to obtain repayment in full, with interest, costs and reasonable attorney's fees of the loans he, through an entity he owns and controls, made to the Debtor.

80. Accordingly, the Court should award damages in favor of Dr. Patel and against each of the Defendants, jointly and severally, in an amount to be proven at trial based upon their tortuous interference with Dr. Patel's relationship with the Debtor.

**WHEREFORE,** the Plaintiff respectfully requests entry of an order and judgment in his favor and against (a) Carbon Cayman (i) equitably subordinating the claim, as amended, filed by Carbon Cayman; (ii) designating Carbon Cayman as an entity that is not entitled to vote on the pending (or any other) Plan of Reorganization to the extent that the Court concludes that it has such a right to vote; (b) Carbon Cayman, Blackrock and Midland, jointly and severally, and in favor of Dr. Patel in an amount to be proven at trial based upon their tortuous interference with Dr. Patel's relationship with the Debtor, and (c) awarding such other and further relief as the Court deems just and proper or to which Plaintiff is entitled.

Respectfully Submitted,

Date: November 3, 2010      By:      _s/ John R. Gotaskie, Jr._
                                     John R. Gotaskie, Jr.
                                     PA Id. No. 81143
                                     Amy Kerr Parker
                                     PA Id. No. 89054
                                     Fox Rothschild LLP

625 Liberty Avenue, 29th Floor
Pittsburgh, PA 15222-3115
jgotaskie@foxrothschild.com
aparker@foxrothschild.com
Telephone:  (412) 391-1334
Facsimile:  (412) 391-6984

OF COUNSEL:

James D. Gassenheimer (admitted *pro hac vice*)
FL. Bar ID No. 0959987
Berger Singerman
200 S. Biscayne Boulevard, Suite 1000
Miami, FL 33130
jgassenheimer@bergersingerman.com
Telephone:  (305) 714-4383
Facsimile:  (305) 714-4340

Brian G. Rich (admitted *pro hac vice*)
FL. Bar ID No. 038229
Berger Singerman
125 South Gadsen Street, Suite 300
Tallahassee, FL 32301
brich@bergersingerman.com
Telephone:  (850) 521-6725
Facsimile:  (850) 561-3013

*Counsel to Dr. Kiran Patel*